486 A.2d 1004

Randoll PIERCE & Rosemary Pierce

v.

PHILADELPHIA HOUSING AUTHORITY and Ernest Dixon

v.

ALBERT J. KAYTES & COMPANY, Appellant

**and**

Randoll PIERCE & Rosemary Pierce

v.

Sarah STEINBERG and Albert J. Kaytes & Co., Appellant

v.

PHILADELPHIA HOUSING AUTHORITY.

Superior Court of Pennsylvania.

Argued Sept. 5, 1984.

Filed Jan. 11, 1985.

Alton G. Grube, Sellersville, for appellants (1231 and 1232).

James M. Marsh, Philadelphia, for Philadelphia Housing, appellees (1231 and 1232).

Before CIRILLO, OLSZEWSKI and MONTGOMERY, JJ.

MONTGOMERY, Judge:

The appeal in this case arises from the lower court's granting of a directed verdict as to one defendant in a consolidated personal injury action involving several defendants. The remaining defendants contested the directed

verdict by the filing of motions for judgment n.o.v. or a new trial. These motions were denied in the lower court.

The record shows that the Plaintiff, Randoll Pierce, was injured on November 1, 1976, in a fall on a cellar stairway of a single family dwelling located at 2019 North 30th Street in Philadelphia. At the time, Pierce was an employee of a third party, and the purpose of his visit was to conduct repairs on a household appliance. The building was owned at that time by the Defendant-Appellant Sarah Steinberg (hereinafter referred to as "Steinberg"). Albert J. Kaytes & Company (hereinafter referred to as "Kaytes"), another Defendant-Appellant, was Steinberg's agent with respect to the property, and apparently had managerial functions with respect to it.

On December 4, 1968, Kaytes, acting as Steinberg's agent, entered into a lease covering the property, with the Philadelphia Housing Authority (hereinafter referred to as "PHA"), the Defendant-Appellee on this appeal. Details concerning that lease will be more fully discussed later in this Opinion. PHA in turn sub-let the premises to one Ernest Dixon, who lived at the dwelling at the time of the Plaintiff's injuries.

The Plaintiff instituted separate suits against Steinberg and Kaytes, and against PHA, asserting causes of action based upon negligence. In each action, the respective defendant or defendants joined the other or others as additional defendants. The two cases were consolidated for trial. At the conclusion of the presentation of all of the evidence, the court granted a motion by PHA for a directed verdict. Before the case was submitted to the jury, Steinberg and Kaytes settled with the Plaintiff, receiving a release as to all of the Defendants.

The Appellants maintain that the lower court erred in this case in directing a verdict in favor of the Appellee PHA. In *Cox v. Equitable Gas Company*, 227 Pa.Super. 153, 324 A.2d 516 (1974), our Court reviewed the applicable law, and discussed the standard by which a motion for directed verdict must be evaluated. It was explained by Judge

Cercone in his Opinion that the trial court must accept as true all facts and proper inferences in the evidence which tend to support the contention of the party against whom the motion has been made, and must reject all testimony and differences to the contrary. It was also declared that only a clear case should be removed from the jury, and when there is any doubt, the motion should be denied. This appeal must be evaluated in light of such standards.

■ The parties in this case and the lower court apparently all agree that the issue of PHA's potential liability rested upon questions of its obligations as a landlord and of the degree of its possession and control of the premises where the Plaintiff was injured. It is held that a landlord is liable to a lessee and others lawfully on the premises for physical harm caused by a dangerous condition in a part of the premises over which the landlord retains control if by the exercise of reasonable care the landlord could have discovered the condition and risk involved, and made the condition safe. See *Smith v. M.P.W. Realty Company, Inc.*, 423 Pa. 536, 225 A.2d 227 (1967) and authorities cited therein. The *Smith* case was one where the landlord retained partial control of the property. Generally, where the landlord is out of possession, it is not liable for bodily harm sustained on the property by one on the premises under the lessee's right unless the landlord knew, or had reason to know of a defect at the time of leasing. See *Dinio v. Goshorn*, 437 Pa. 224, 270 A.2d 203 (1969), a case in which the Court found that the out-of-possession landlord had retained no control.

■ This case presents an unusual fact situation in which the party in question, PHA, is both a lessee and a lessor as to the premises in question. Documentary evidence and testimony was presented upon the questions of its possession, control and inspection of the North 30th Street property. Our detailed review of all of the evidence and testimony presented in the case leads us to the conclusion that the lower court erred in directing a verdict in favor of PHA.

We cannot find that there was an absence of doubt as to its potential liability.

The record shows that the lease between Kaytes and PHA, covering an initial term from December 4, 1968 through December 3, 1971, with renewal options through October 17, 1978, was a form lease of PHA. It contained the following provisions relating to possession, control and inspection:

Said Premises are to be sub-let by the Authority [PHA] to a low-income family (hereinafter called "sub-tenant" or "sub-lessee") in accordance with the requirements of its leased housing program under Section 23 of the United States Housing Act of 1937, as amended, to be used and occupied solely by the sub-lessee as a private dwelling. The eligibility of sub-tenants, the selection of sub-tenants, and the termination of their occupancy shall be effected only by the Authority; but the Authority will at any time consider representations by the Lessor [Kaytes] regarding the termination of any occupancy.

\*      \*      \*      \*      \*      \*

5.  The Authority covenants and agrees as follows:  ...
    B.  To permit the Lessor to enter the Premises at any reasonable time for the purpose of making repairs or to determine the condition of the Premises and/or compliance with the conditions of this lease by the Authority or its sub-lessee.
    C.  To permit the Lessor, during a period of sixty (60) days prior to the expiration of this lease, to show the Premises to prospective tenants or purchasers at all reasonable times and to exhibit notices for letting or sale.
    D.  To notify the Lessor promptly of any defect appearing in any part of, or in any equipment at the leased Premises which the Lessor is obligated to maintain and operate.
6.  The Lessor hereby covenants and agrees as follows:
    A.  That the Authority and its sub-lessee shall have peaceful possession of the premises herein leased.

B. To make all structural and other repairs, including specifically, but not limited to, repairs to the roof, plumbing, exterior walls, screens, steps, walks, fences and painting, and repair or replacement of heating equipment and cooking range, as any such become necessary during the term of this lease or any extension thereof. Repairs or replacements as aforesaid shall be at Lessor's sole expense. Any and all permits, licenses and the like required to permit the Authority to have the premises occupied for the purpose herein stated will be obtained by the Lessor at his expense. In the event the Lessor fails to comply with these provisions within a reasonable time after notice, the Authority may do so and deduct the expense thereof from the rent or collect the cost from the Lessor.

C. To redecorate the Premises throughout in a reasonable and workmanlike manner on a three-year cycle computed from the inception of this lease. It is understood that the exercise of any option by the Authority which would extend occupancy beyond three years from inception or from last redecoration is on the basis that redecoration as aforesaid will be accomplished on the three-year schedule. In the event the Lessor fails to comply with this provision within a reasonable time after notice, the Authority may do so and deduct the expense thereof from the rent, or collect the cost from the Lessor.

\*     \*     \*     \*     \*     \*

7. It shall be the duty and responsibility of the Authority to prevent the sub-lessee from violating any of the covenants and conditions of this lease with respect to the Premises, and the Authority will take such action as it may deem necessary to abate any violation of this lease by the sub-lessee upon notice from the Lessor or otherwise.

\*     \*     \*     \*     \*     \*

10. Upon expiration of the term of this lease, any extension thereof, or termination, as set forth in Section 9,

the Authority will return the Premises to the Lessor in the same condition they were when leased, except for ordinary wear and tear and damage caused by acts of God, fire, riots or acts of the Lessor, his agents or employees.

Several aspects of these lease provisions clearly raise factual questions regarding the issues of possession, control and inspection as to PHA. The unnumbered paragraph first recited above indicates that the Authority will assume control of the premises, vis-a-vis Kaytes, to the extent that PHA will retain sole discretion on the eligibility, selection and termination of occupancy of any sub-tenants. Presumably, if no eligible sub-tenants was in the premises for some time period of the lease term, it would be contemplated that PHA would be in possession of the premises itself, with the authority and control necessary to either sub-lease or leave the premises vacant. In paragraphs 5.B. and 5.C. the PHA agreed to permit Kaytes to enter the premises for repairs, to determine the condition of the premises, to assure compliance with the lease by PHA or its sub-lessee, or to show the property near the end of the lease term. Certainly, such provisions infer that PHA will retain possession and/or control of the building sufficient to allow it to give Kaytes access for the purposes stated.

Paragraphs 5.D. and 6.B. have a relationship and should be discussed together. 5.D. indicates a possible degree of control and possession by PHA, as well as a recognition of an ongoing duty and a right of inspection. It provides. that PHA agrees to notify Kaytes promptly of defects appearing in any part of the premises or in equipment at the premises which Kaytes is obligated to maintain. 6.B. recites the structural and other repairs which the lessor has agreed to complete. These clauses must be construed to indicate that the parties, including PHA, contemplated that PHA would retain possession and control sufficient to carry out planned inspections of the premises for defects. As will be discussed below, such inspections apparently took place.

Proof of some retention of possession in the premises by PHA could not be made clearer than in the wording of paragraph 6.A. of the PHA lease, which recites that PHA shall be assured of having "peaceful possession" of the premises, together with any sub-lessee. In such regards, a retention of possession is implied and a degree of control over the premises is strongly suggested in the PHA-sub-lessee relationship, in paragraph 7, where the PHA agrees to prevent any violations of the lease by the sub-lessee. The "duty and responsibility" undertaken therein by the PHA could not be accomplished without some maintenance of a degree of control over the premises, and PHA's retention of a right of inspection could also thereby be contemplated. The same elements are suggested by Paragraphs 6.B. and 6.C., which require repairs and redecoration by Kaytes, which could be ordered or inspected by PHA, and completed by PHA, at Kaytes expense, if the Lessor fails to do so. Finally, a degree of possession and/or control by PHA is implied in its agreement, in paragraph 10, to "return the premises" to Kaytes in a reasonable condition.

■ All of these lease provisions, suggesting a degree of possession and control, as well as inspection obligations, by PHA, militated against a direction of a verdict in favor of the Appellee at trial. The lower court appears to have perceived this situation. In its opinion, the court stated: "The language of the lease is not clear on the issue of whether PHA was to retain possession and control of the property after it was leased to a low income tenant." This recognition of a lack of clarity in the lease provisions should have convinced the lower court to deny PHA's motion for a directed verdict.[1]

The lease did not comprise the only evidence in the record which created an issue for the jury concerning PHA's liability in this case. For instance, the deposition testimony

1. Any ambiguity in the language of the lease, or uncertainty concerning the meaning of the language used, must be resolved and construed most strongly against the PHA, the party which drafted the lease in this case. See *Cusamano v. Anthony M. DiLucia, Inc.*, 281 Pa.Super. 26, 421 A.2d 1120 (1980).

of Richard Eisele, a PHA employee, was entered into evidence at trial. That testimony was to the effect that the PHA considered itself to be managing the property. When questioned as to what it meant to "manage" the property, the witness responded that it meant taking care of maintenance, as well as collecting rent. Mr. Eisele agreed that the PHA maintenance work under the lease would include some maintenance on the stairways of the premises. All of this testimony created inferences not only of possession and/or control by the Appellee, but also responsibility to keep the stairways of the property in good repair. Because the Plaintiff asserted negligence regarding the condition of the stairs upon which he was injured, the latter evidence was especially significant. We find that such testimony provided evidence of possible liability on the part of PHA sufficient to have made it an error to direct a verdict in its favor.

An agent of the Appellant Kaytes also provided testimony which showed some degree of possession, control and responsibility for repairs by the Appellee. The witness, Louis Magaro, testified that when repairs were necessitated by normal wear and tear, Kaytes would have the obligation to make repairs. However, where a condition was caused by tenant neglect, the PHA would make the repairs or have Kaytes do it and then reimburse Kaytes. Further, Mr. Megaro testified that the Appellee would give Kaytes notices, on standard PHA forms, when repairs to the premises were needed. The witness also disclosed that the Appellee had informed him of the accident which gave rise to the Plaintiff's claims in this case, but had performed needed repairs itself, rather than having Kaytes do them. Mr. Magaro's testimony, in these particulars, furnished additional indicia of possession, control, and repair duties for which PHA had responsibilities. Again, such evidence should have compelled the lower court to deny a directed verdict to PHA.

As noted earlier, the applicable law provides that a landlord out of possession should not be held liable for harm caused to persons on the premises unless it knew or had

reason to know of the harm-causing defect at the time of leasing. From the evidence discussed above, including the lease and the testimony recited, it would be unreasonable to find that no proof of possession by the PHA was presented. However, even if we ignore such proof and assume that PHA could only be considered to be a landlord not in possession, there was still enough evidence presented to preclude to issuance of a directed verdict in its favor.

Such evidence was provided through the testimony of Ronald Kobelin, an expert witness for the Plaintiff. Mr. Kobelin expressed the opinion that the particular unsafe condition of the stairs in issue had existed for at least ten to fifteen years prior to the Plaintiff's fall. Both Kaytes and PHA admitted that no significant repairs had been made on the stairs at any relevant time prior to the accident. Thus, there was evidence that the harmful condition existed prior to the PHA sub-lease of the premises to Ernest Dixon. If credited by the jury, such testimony would have established that PHA, even as a landlord out of possession, could have been held liable by the jury because of the harm-causing defect, of which the PHA had reason to know at the time of its sub-leasing of the premises. Therefore, even if the lower court concluded that the record was barren of evidence suggesting continued possession of the property by PHA, it should not have directed a verdict in light of the evidence that a defect was in existence of which PHA should have had knowledge before Mr. Dixon attained possession.

The directed verdict for PHA was improper. The lower court should have granted the Appellants' motion for a new trial. It is apparent that this case will have to be remanded to the lower court for further proceedings to address the respective rights and liabilities of the Appellee and Appellants.

The order of the lower court is reversed, and this case is remanded for further proceedings. Jurisdiction is not retained.